ROBERT M. WEBER AND ETHELYN GAIL WEBER,
APPELLEES AND CROSS-APPELLANTS, V.
J. SIG SWENSON ET AL., APPELLANTS
AND CROSS-APPELLEES.

295 N.W.2d 688

Filed August 8, 1980. No. 42888.

Richard C. Swenson for appellants.

Harry R. Meister of Winner, Nichols and Meister for appellees.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

McCOWN, J.

The plaintiffs filed an action for foreclosure of a real estate note and mortgage executed pursuant to a contract for the sale and development of land. The defendants filed a cross-claim for damages for breach of the contract. The District Court for Scotts Bluff County,

Nebraska, dismissed plaintiffs' foreclosure action and also dismissed the defendants' cross-claim for damages. The defendants have appealed and the plaintiffs have cross-appealed.

On July 12, 1976, after extensive negotiations in which the parties were both represented by attorneys, a contract of sale was entered into under which the defendants Swenson agreed to purchase and the plaintiffs Weber agreed to sell approximately 160 acres of farmland adjacent to the city of Gering, Nebraska, for $400,000. The land was to be developed by Swensons and the Webers were to cooperate in the development.

The purchase price was payable $5,000 down on execution of the contract, $25,000 30 days after execution, and $20,000 120 days after execution. The Webers were to execute a warranty deed to the entire tract to the Swensons, and the Swensons were to execute a note and real estate mortgage for the $350,000 balance of the purchase price, with interest at 8 percent per annum. The balance of the purchase price was payable by annual principal payments of at least $35,000 per year, plus the interest accrued on the principal payment amount. The first annual payment was due January 10, 1978, and thereafter on the same date each year, with the entire balance due and payable December 31, 1986.

Upon payment of the initial $50,000, 15 acres to be selected by Swensons were to be released from the mortgage by Webers. Thereafter, 1 acre was to be released for each $3,125 principal paid, plus interest accrued on that amount to the date of release. Any platted lots were to be released for a proportionate share of the acre release price. Swensons agreed to make minimum release payments of not less than $35,000 per year, together with interest payable thereon, not later than January 10 of each succeeding year beginning with 1978.

The agreement provided that the total amount received by Webers in 1976 could not exceed 29 percent of the total purchase price. Release payments made in subsequent years were to be credited to minimum principal payments due January 10 of the following year, and if the

release payments made by Swensons in any calendar year were beyond the necessary principal payments of $35,000 for any 1 year, plus interest, such payments were to be credited to the succeeding year's minimum requirements, and if the entire purchase price was not paid by December 31, 1986, the remaining balance would be due and payable on that date. All unpaid principal balances on the note and mortgage were to bear interest at the rate of 8 percent per annum.

On July 12, 1976, J. Sig Swenson executed a promissory note for $350,000 payable to the Webers, with interest at the rate of 8 percent per annum from date until paid. The note provided: "Principal and interest payable in accordance with the agreement dated July 12, 1976, a copy of which is attached hereto marked Exhibit 'A' and by this reference made a part of this note."

A form of mortgage was prepared but apparently not executed or delivered. The mortgage was also dated July 12, 1976, and provided that the mortgage principal of $350,000 was payable according to the tenor and effect of the mortgagors' written promissory note bearing even date.

Initially, the parties worked harmoniously in obtaining necessary zoning, platting, annexation, and necessary utilities districts, and on August 26, 1976, the city of Gering, Nebraska, created a paving district, water district, and sanitary sewer district on portions of the land.

The Swensons, however, were unable to pay the $25,000 payment due on August 12, 1976, and extensive negotiations took place which culminated in a supplemental agreement executed on October 1, 1976. Except for changes in dates of the original $50,000 downpayments, the supplemental agreement made no changes in the payment of principal or interest, nor in the general provisions for release payments. The supplemental agreement, however, did amend paragraph 11 of the original contract of July 12, 1976. The original agreement provided that Swensons would not encumber the

tract with any utilities, paving, and other special assessments without first obtaining approval of the project engineer. The supplemental agreement substituted for that provision the following language:

"Swenson agrees that he will not install or cause to be installed any utilities, paving and other special assessments, including but not limited to water, sewer, gas curb and gutter and paving designed to serve in excess of eleven unreleased acres; and that all utilities installed shall serve tracts, parcels, or lots contiguous to D street or to the tracts, parcels or lots previously released to Swenson. Swenson agrees to pay the minimum release payments of not less than $35,000 on this unreleased acreage not later than six (6) months after the date that the special assessments are levied against the real estate if this six (6) months occurs before the regular yearly minimum release price comes due under paragraph 1.4 of the Agreement of July 12, 1976."

On October 1, 1976, the Swensons also executed a real estate mortgage on all the property for the sum of $350,000 "to secure the payment of the promissory note of this date made by the mortgagor for $350,000 payable according to the tenor and effect of the mortgagors' written promissory note bearing even date with these presents." There is no evidence of any promissory note except the one dated July 12, 1976.

The mortgage also provided: "In case of default in the payment of the principal sum or any installment thereof or of any interest thereon when the same shall become due or in case of the non-payment of any taxes or assessments or of the failure to maintain insurance as herein provided, mortgagee may at the option of mortgagee, without notice, at any time during the continuance of such default or breach, declare the whole debt secured by this mortgage to be immediately due and payable and may foreclose this mortgage for the satisfaction thereof." No other default in performance under the contract of July 12, 1976, constituted a default under the mortgage.

Paragraph 13 of the contract of July 12, 1976, provided: "In the event of the failure of Swenson to perform any

of the terms and conditions of this agreement on his part to perform, Webers shall have the option to declare the agreement null and void and to retain the $5,000 or $30,000 if previously paid by Swenson before default, or to pursue any and all remedies available at law or equity." The supplemental agreement of October 1 made no changes in those provisions.

During 1977, release payments on several lots were made by the Swensons and releases executed by the Webers. There was, however, a disagreement between the parties with respect to the sale by the Swensons of a part of the tract to John Stuart, subject to the Weber mortgage. The Webers asserted that the sale was in violation of a nonassignment clause and that they were entitled to release payments for the land sold to Stuart. Webers also complained that the estimated total acreage to be served by utilities would exceed the 11 unreleased acres provided in the supplemental agreement. There were also some disputes with respect to rentals due under the farming lease of the undeveloped portion of the real estate and the accounting under it.

On May 9, 1977, the city of Gering levied special assessments for water and sewer districts against some of the platted portions of the property, and on August 8, 1977, special assessments for paving were levied. There is evidence that the special assessments were levied against more than 11 unreleased acres, in violation of the provisions of the supplemental contract, but there is also evidence by the project engineer that the acreage served by the utilities was less than that when alleys and streets were excluded.

In October 1977, Swenson and Weber had an extensive discussion of their differences about the contract matters and Weber advised Swenson that the $35,000 minimum release payment would be due on November 9, 1977, 6 months after the first levy of the special assessments on May 9, 1977.

On November 14, 1977, Webers notified the Swensons in writing that they were in default and that the Webers

were declaring the entire amount of principal and interest due and payable at once for failure to pay principal, interest, taxes, and assessments when due. On November 17, 1977, Swenson tendered a check in the amount of $28,808.32 for the release of 32 lots. The Webers refused the tender and on November 23, 1977, filed their petition praying for foreclosure of the mortgage. In December 1977, Swenson again tendered the $28,808.32 check, together with an additional $20,237.20 for release of 22 additional lots. The Webers also refused this tender.

Swensons' answer denied that there was any default and alleged that, if there had been a default, the default had been waived by the Webers. The Swensons also filed a cross-claim against the Webers alleging that the Webers had slandered the reputation of Swensons and their credit standing, had refused to release portions of the real estate from the mortgage, and had refused to accept tenders of payment. It was alleged that such conduct made it impossible for the Swensons to meet their obligations under the contract and constituted an anticipatory breach of the contract. As a result, the Swensons alleged that they had had to purchase additional land for development at a price in excess of the contract price of the Weber land and had lost profits they could reasonably have anticipated under the Weber contract, and prayed for damages. The two actions, one for foreclosure and one for breach of contract, were consolidated by agreement between the parties with the consent of the court.

The actions here were tried in the District Court for Scotts Bluff County in February 1979. On May 8, 1979, the District Court made findings of fact and conclusions of law and entered judgment finding generally for the defendants upon the plaintiffs' petition for mortgage foreclosure, and for the plaintiffs on the defendants' cross-claim for breach of contract, and dismissed plaintiffs' petition and also dismissed defendants' cross-claim. Both the plaintiffs and the defendants filed motions for new trial which were overruled. The defendants Swen-

son have appealed and the plaintiffs, Webers, have cross-appealed.

The record discloses that, on May 22, 1979, following entry of judgment in this case, Webers made demand in writing upon Swensons to make principal and interest payments current by May 29, 1979, or Webers would again declare a default. No payments were made, and on May 30, 1979, Webers declared the entire amount of principal and interest on the note and mortgage due and payable at once. On July 8, 1979, a new foreclosure action was filed by Webers against the Swensons. That foreclosure action is pending in the District Court for Scotts Bluff County.

The appellants Swenson contend that the trial court erred in dismissing their cross-claim for breach of contract. Their position is that the Webers' declaration of default and acceleration of payment in November 1977, and refusal of tenders of payment thereafter, was an anticipatory breach of contract which made it impossible for the Swensons to perform their contractual obligations thereafter.

The District Court found that there was a total failure of proof on the issue of damage to reputation and insufficient proof of lost profits and general damages. The trial court found that the Swensons had not met the burden of proving that the actions of the Webers constituted an actionable breach of contract or proximately caused the damages and loss of profits claimed.

The cross-claim for breach of contract is an action at law, and the findings and judgment of the District Court rested upon factual determinations and findings based upon conflicting evidence. The judgment of the trial court in an action at law where a jury has been waived has the effect of a verdict of a jury and it will not be set aside on appeal unless clearly wrong. *Fabricators, Inc. v. Farmers Elevator, Inc.*, 203 Neb. 150, 277 N.W.2d 676 (1979). If the Swensons' cross-claim is treated as a matter in equity simply because of its consolidation with the foreclosure case, the result in this case remains the same.

On an appeal from a judgment in equity, when credible evidence on material questions of fact is in conflict, the Supreme Court will consider the fact that the trial court observed the witnesses and their manner of testifying and accepted one version of the facts rather than the other. *Gasper v. Moss*, 204 Neb. 24, 281 N.W.2d 213 (1979). Whichever rule is applicable, there was ample evidence to support the judgment of the trial court, and the dismissal of the cross-claim was correct.

The cross-appellants, Webers, contend that the levy of special assessments on May 9, 1977, and the Swensons' failure to make release payments of $35,000 within 6 months thereafter constituted a default under the provisions of the note and mortgage and entitled Webers to declare the entire balance of principal and interest due and payable at once and to foreclose the mortgage. They contend that the court erred in determining that there was a waiver of the supplemental contract provision against special assessments on unreleased acreage of more than 11 acres and in finding that there was no default in payment of principal and interest on the note secured by the mortgage.

The District Court found that the Webers' action here was not a forfeiture or rescission of the contract but to foreclose the real estate mortgage given to secure the note of July 12, 1976. The trial court specifically determined that there must be a breach of a condition of the mortgage involving either a failure to pay principal, interest, taxes, or assessments, or to maintain insurance in order to entitle the Webers to accelerate the entire balance due and foreclose the mortgage.

It should be noted that the note of July 12, 1976, provided that principal and interest on the note were payable in accordance with the agreement dated July 12, 1976, a copy of which was attached to and made a part of the note. The evidence does not show any amendment or changes in the note. Neither does the evidence show that the attached contract was ever altered.

The District Court found that there was a default by

Swensons under the supplemental contract with respect to allowing special assessments on more than 11 unreleased acres, but that the Webers had waived compliance with that requirement by participating in establishing the utility districts, their configuration and size, and permitting the utilities to be installed after advance notice by the Swensons in December 1976 as to the extent and nature of the installations to be made.

The District Court also found that the provision of the supplemental contract of October 1, 1976, requiring minimum release payments on unreleased acreage not later than 6 months after the date that the special assessments are levied, if the expiration of the 6-month period occurs before the regular yearly minimum release price becomes due, was inserted at the request of the Webers and should be construed most strongly against them. The court found that the entire scheme of the agreement was to make lots salable, and that the special assessments language was plural rather than singular. The court, therefore, found that a single assessment would not start the running of the 6-month period, and that the 6-month period would not begin to run until the assessments and levies for improvements sufficient to make the lots salable had been made. The District Court, therefore, concluded that the 6-month period did not commence to run on May 9, 1977, when the first assessment was levied, but commenced to run on August 8, 1977, when the final assessment was levied. The court then found that there was no default in November 1977 when this foreclosure action was filed.

Foreclosure is not available where there has been no default on the part of the mortgagor. 55 Am. Jur. 2d *Mortgages* § 554 (1971). The right to accelerate maturity of indebtedness is limited to the grounds set forth in the instrument, and if the maker is not in default so as to give rise to the right of acceleration, the maturity of the note cannot be accelerated. A right to accelerate, in order to be effective, should be clear and unequivocal, and if there is a reasonable doubt as to the meaning of the terms em-

ployed, preference should be given to the construction which will avoid the forfeiture and prevent acceleration of maturity. 10 C.J.S. *Bills and Notes* § 251 (1938).

There is serious question as to whether the added release payment provisions of the supplemental contract were applicable to the note of July 12, 1976. Even if those provisions were applicable, however, the trial court found that there was no default at the time the foreclosure action here was filed in November 1977, and there was ample evidence to support that finding. In addition, the matters involved in the cross-appeal appear to be moot in view of the fact that a new foreclosure action for subsequent defaults is now pending in the District Court for Scotts Bluff County.

The remaining assignments of error of the appellants and cross-appellants are without merit. The judgment of the District Court is affirmed.

AFFIRMED.

BOSLAUGH, J., concurs in result.